534

## STATE OF CONNECTICUT *v.* RICHARD OSTROSKI
## (12229)

PETERS, C. J., HEALEY, DANNEHY, CALLAHAN and HENDEL, Js.

Argued September 30—decision released December 9, 1986

*Kathleen Eldergill,* for the appellant (defendant).

*John M. Massameno,* assistant state's attorney, with whom, on the brief, were *John M. Bailey,* state's attorney, and *Edward F. Spinella,* former assistant state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. During the night of April 11–12, 1977, a nineteen year old woman was brutally stabbed to death. Following his indictment, the defendant, Richard Ostroski, was charged with her murder in violation of General Statutes (Rev. to 1977) § 53a-54a (a) and (c).[1] After a trial by a panel of three judges of the Superior Court,[2] the defendant was found guilty and

---

[1] General Statutes (Rev. to 1977) § 53a-54a (a) and (c) provides: "MURDER DEFINED. AFFIRMATIVE DEFENSES. EVIDENCE OF MENTAL CONDITION. CLASSIFICATION. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime. . . .

"(c) Murder is punishable as a class A felony unless it is a capital felony and the death penalty is imposed as provided by section 53a-46a."

[2] General Statutes (Rev. to 1981) § 54-82 (b) provides: "If the accused is charged with a crime punishable by death or imprisonment for life and elects to be tried by the court, the court shall be composed of three judges consisting of the judge presiding at the session and two other judges to

sentenced to a prison term of not less than twenty-five years nor more than life. On appeal from this conviction, the defendant argued that the trial court erred in denying his motion to suppress "potential testimony or other evidence that was obtained in violation of the constitution or laws of the United States or the State of Connecticut." *State* v. *Ostroski,* 184 Conn. 455, 456, 440 A.2d 166 (1981) (*Ostroski I*). This court remanded the case to the trial court for further articulation on the issue of the defendant's custody. Id. On remand, the trial court found that the defendant was not in police custody until his formal arrest following his confession. On the defendant's appeal after remand, this court reversed the defendant's conviction, ruling that the defendant had been in state police custody during interrogation, that such custody was without probable cause, and that the trial court had erred in admitting into evidence his confession and certain physical evidence obtained from the defendant as a result of the interrogation. *State* v. *Ostroski,* 186 Conn. 287, 440 A.2d 984, cert. denied, 459 U.S. 878, 103 S. Ct. 173, 74 L. Ed. 2d 142 (1982) (*Ostroski II*). The judgment was set aside and a new trial ordered.

After retrial, the jury, on April 19, 1983, found the defendant guilty of murder. The defendant was sentenced to a prison term of not less than twenty-five years nor more than life. The defendant has appealed.

The defendant raises four issues on appeal. He claims that the trial court erred in granting the state's pretrial motions for nontestimonial evidence; in denying his motion to dismiss and motion to dismiss the indictment; and in denying his request to charge on the lesser included offense of manslaughter in the first degree.

be designated by the chief justice. Such judges, or a majority of them, shall have power to decide all questions of law and fact arising upon the trial and render judgment accordingly."

The defendant also claims that he was denied effective assistance of counsel. We find no error.

I

In his initial claim of error, the defendant maintains that the trial court erred in granting the state's motions for nontestimonial evidence.[3]

Before the defendant's second trial, the state, pursuant to Practice Book § 776,[4] filed nine motions for nontestimonial evidence. Three of the motions were directed toward obtaining the defendant's palm print, three toward obtaining a blood sample, and three toward obtaining a saliva sample, from which his blood type could be determined. Although the state already had in its possession a palm print and blood sample, these samples could not be used at trial because of our ruling in *Ostroski II*. In these motions the state sought an untainted source for this same evidence.

Each of the three sets of motions relied, respectively, on three different affidavits filed by the state. The first affidavit contained twenty-four paragraphs

---

[3] The defendant also claims that the trial court erred in denying his motion to suppress evidence obtained pursuant to the state's motions for nontestimonial evidence. The trial court treated and decided the state's motions and the defendant's motion together, apparently assuming that the state's right to obtain evidence from the defendant and its right to use the evidence at trial were coextensive and dependent upon the same factors and analysis. To the extent that these motions require resolution of the same constitutional issues, we will do the same.

[4] Practice Book § 776 provides: "Upon motion of the prosecuting authority, the judicial authority by order may direct a defendant to participate in a reasonably conducted procedure to obtain nontestimonial evidence under Sec. 775, if the judicial authority finds probable cause to believe that:

"(1) The evidence sought may be of material aid in determining whether the defendant committed the offense charged; and

"(2) The evidence sought cannot practicably be obtained from other sources."

and detailed all the information known by the police prior to the defendant's illegal arrest.[5] The second

5            "AFFIDAVIT SUBMITTED BY
EDWARD SPINELLA, ASSISTANT STATE'S
ATTORNEY

"I, Edward Spinella, swear to the following:

"(1) On April 12, 1977 at 3:11 AM the Canton Police received a complaint from Donald Miller that his girlfriend, [the victim], was gravely injured in their apartment, A-1, 156 Main Street, Collinsville, Connecticut.

"(2) Responding officers found at 3:13 AM on April 12, 1977 the body of [the victim] at apartment A-1. The body was clothed only with a bathrobe. The body was found, face down, in the living room. There was blood under the neck and head of [the victim]. A knife with blood was found beside the body as well as a broken ceramic [statue]. A bloodied bent knife was found in the kitchen on a counter. A bloodied rag was found in the kitchen sink. A knife was found under the bloodied rag. There were drops of blood leading from the body to the kitchen sink. There were drops of blood leading from the living room to the west door of the apartment to the hall to outside of the apartment building down the walk area into the apartment parking lot.

"(3) A latent palm print of a human was found in blood on the kitchen counter by investigating officers.

"(4) The latent palm print, the blood from the kitchen floor, living room rug, hallway, pathway, and parking lot, samples of the victim's blood, the knives and the bloodied rag, were taken on April 12, 1977 as evidence by the Connecticut State Police Department for testing and preservation.

"(5) Trooper [Robert] Mills of the State Police Forensic Laboratory tested the items on April 14, 1977 and found:

"(a) that human blood, type AB, was the 'red substance' found in the parking lot.

"(b) that human blood was on the handle of the knife found beside the victim's body and that such blood was a combination of type AB and type O; and,

"(c) that the victim had type O blood.

"(6) Investigation on April 16, 1977 at 9:00 AM revealed that the victim was seen alive in her apartment at approximately 1830 hours, April 11, 1977.

"(7) Investigation during the morning of April 16, 1977 revealed that Cynthia Rusin on April 11, 1977 at 2100 hours peered through the victim's kitchen window and 'everything looked in order.'

"(8) An investigating officer touched the victim's body at approximately 3:13 AM on April [12], 1977 and the body felt warm.

"(9) Dr. [Edward] Diters, Assistant Medical Examiner, pronounced [the victim] dead at 3:41 AM on April 12, 1977.

"(10) Dr. Elliot Gross, then Chief Medical Examiner for the State of Connecticut, on April 15, 1977 ruled [the victim's] death to be a [homicide] and

affidavit contained the twenty-four paragraphs of the first affidavit and four additional para-

certified the cause of death as 'Blunt force injury to head, incised wounds of neck and larynx, multiple stab wounds of chest, abdomen, left lung, stomach, spleen. External and internal hemorrhage.'

"(11) The local and State Police upon receipt of the complaint on April 12, 1977, began a general investigation into [the victim's] death.

"(12) Pursuant to this general investigation, the police learned on April 12, 1977 from Jennifer and Steven Quigley that on April 8, 1977 at approximately 9:00 PM the victim answered a knock at her apartment door, that a white male with blond hair and a beard asked them to come to a party across the hall and that the victim refused.

"(13) On April 14, 1977 Jennifer and Steven Quigley were shown a photograph of Stanley Allen who lived across the hall from [the victim]. They positively identified the person depicted in the photo as *not* being the male seen at the apartment door on April 8, 1977. However, Steven Quigley again described the unknown male to one of the officers, Lt. [John] LaDucer. Lt. LaDucer at that time thought the description fit Richard [Ostroski] of 6 Market Street, Collinsville, Connecticut.

"(14) The address, 6 Market Street, Collinsville, Connecticut, is within one quarter mile of the scene of the [homicide].

"(15) On April 13, 1977 as a part of the continuing investigation prints of six violent males, plus Donald Miller, who lived in the area were sent to the Connecticut State Police Laboratory for possible comparisons to latent prints found at the scene of the crime. The defendant was one of the six violent prints.

"(16) On April 15, 1977, the police contacted the defendant's mother to determine his whereabouts. She was evasive but indicated he was out-of-state.

"(17) On April 15, 1977, a photo of the defendant was shown to Jennifer and Steven Quigley. They both positively identified him as the male who asked [the victim] on April 8, 1977 to a party across the hall.

"(18) On April 13, 1977 Officer [Harold] Scheidel of the Canton Police Department received a complaint from Mrs. Deborah Matava that the defendant's dog had been left alone since April 12, 1977. Mrs. Matava also lived at 8 Market Street, Collinsville, Connecticut.

"(19) On April 13, 1977 Officer Scheidel contacted Mrs. Geraldine Edwards, the defendant's mother-in-law. He learned that she had spoken to the defendant's wife, Beverly, on the evening of April 11, 1977 and that the defendant was not home. Additionally, Mrs. Edwards said that the defendant's mother told her that the defendant on April 12, 1977 called to say he was out-of-state.

"(20) On April 13, 1977, Mrs. Edwards said that the defendant's mother told her that during her conversation with Beverly Ostroski on the night

graphs.[6] These additional paragraphs stated that the defendant had confessed to killing the victim and had admitted the crime to his friend, Stanley Allen, who was also a prisoner at that time. The third affidavit contained the first twenty-four paragraphs, the second four paragraphs and eight additional paragraphs.[7] In rele-

of April 11, 1977 no mention was made to her that they, Beverly and the defendant, were going away.

"(21) On April 16, 1977 at 1100 hours Deborah Brennan told investigating officers that she and others, including Stanley Allen who lived across the hall from the victim and the defendant, had gone drinking on April 8, 1977, that they returned to Stanley Allen's apartment on April 8, 1977, that the defendant asked the people across the hall to come to Stanley Allen's to a party and that the defendant shortly thereafter returned and told Stanley Allen that the girl across the hall was 'pretty foxy'.

"(22) On April 16, 1977 at 1859 hours the defendant called the barracks at Troop L. He told Trooper McDermott that he heard Captain Thomas McDonnell wanted to speak with him about a girl being killed. During this call the defendant asked Trooper McDermott if the police were looking for someone with a cut on his hand because he had a small cut on his hand which he received doing carpentry work during the week.

"(23) Prior to April 16, 1977, the police, as part of their investigation, received a copy of the defendant's criminal record which revealed that the defendant had at least seven convictions for public indecency between 1969 and 1976, had served time; and, had a pending assault charge.

"(24) The evidence sought cannot be practicably obtained from other sources." (Emphasis added.)

[6] These four additional paragraphs provided:

"(25) On April 16, 1977 between 9:00 and 11:30 PM the defendant confessed to killing [the victim].

"(26) After he confessed, he was formally arrested and given his Miranda warnings. He was held at the Canton Police Department from April 17, 1977 until April 18, 1977.

"(27) On April 18, 1977 the defendant was presented at 9:00 in the Circuit Court 16 before Judge [Ottaviano]. He was formally advised of his rights after having been appointed a public defender, [Martin] Epstein.

"(28) After his presentment, the defendant was held in lieu of bond at the Hartford Correctional Center. While there he, on April 19, 1977, at approximately 8:30 PM voluntarily told Stanley Allen, who was also under confinement, that he killed [the victim] on April 11, 1977."

[7] These eight additional paragraphs provided:

"(29) The defendant was arrested on a bench warrant for Murder on May 6, 1977.

vant part, these eight additional paragraphs in the third
affidavit asserted that the defendant had been con-
victed of killing the victim and had written an
incriminating poem in a prison newsletter. The multi-
ple motions were filed, according to the state, in order
to distinguish among three alternate bases for the
requests.

The defendant objected to all nine motions. For pur-
poses of clarity in reviewing this issue, however, and
because the trial court granted all nine motions at
the same time, we will treat the defendant's claim as
though made on the basis of the third and most compre-
hensive affidavit. We therefore do not decide the legal
sufficiency of the first or second affidavit. The defend-
ant argued that it would be improper to grant the
motions in that the affidavits supporting the motions
were insufficient. The defendant argued that the first
twenty-four paragraphs, which referred only to infor-
mation obtained prior to the defendant's illegal arrest,
failed to support a finding of probable cause and that
the remainder of the affidavit, paragraphs 25 through
36, could not be considered because it relied upon infor-
mation seized pursuant to the defendant's illegal arrest
and, therefore, was improperly included in the affida-
vit. Specifically, the defendant argued that the use of

"(30) The defendant was appointed counsel, Michael [Conner], on May 10,
1977 in Superior Court Hartford.

"(31) The defendant [was tried] between May 10, 1977 and November 27,
1978 and October 19, 1978 before a three judge panel.

"(32) The defendant testified at his trial. Prior to giving testimony he
was advised again by the court of his rights.

"(33) The defendant was found guilty of murder on October 19, 1978 and
was sentenced on November 27, 1978.

"(34) The defendant while confined at Hartford Correctional Center
awaiting trial often received psychiatric counseling.

"(35) After his conviction and his being sentenced the defendant pub-
lished a poem in a prison newsletter admitting his guilt.

"(36) The evidence sought cannot be practicably obtained from other
sources."

(1) the defendant's initial confession to the police following his illegal arrest (paragraph 25), (2) the subsequent admission made to Allen (paragraph 28), (3) the fact of the defendant's conviction in the first trial (paragraph 33), and (4) the fact that the defendant published a poem in a prison newsletter admitting his guilt (paragraph 35), to support a finding of probable cause was improper in that all of that information constituted "fruits" of the illegal arrest, and, therefore, could not be used as a basis for obtaining additional evidence.

The trial court reviewed the affidavits submitted by the state and, on the basis of the facts contained therein, found that the evidence included in the affidavits was adequate to support the motions. The court, without any articulation of the specific evidence in the affidavits upon which it was relying, ruled that the evidence included in the affidavits was sufficiently attenuated so as to be purged of the taint from the defendant's illegal arrest. Accordingly, the court granted all nine motions, thus allowing the state to acquire the nontestimonial evidence.

At the outset, we note that the fact that the state, at the time of its motions, had in its possession an illegally obtained palm print and a blood sample, both of which were inadmissible at trial on the basis of our decision in *Ostroski II*, does not preclude the state from acquiring, through an untainted source, a second palm print and blood sample. *Bynum* v. *United States,* 274 F.2d 767 (D.C. Cir. 1979). The exclusionary rule applies to suppress evidence obtained in violation of the fourth amendment to the United States constitution. Its sweep is not so broad, however, that it mandates suppression of evidence obtained independently of the illegality. *Segura* v. *United States,* 468 U.S. 796, 813–16, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984); see *Bynum* v. *United States,* supra (fingerprints obtained independently of the illegality admissible, despite suppression

of illegally obtained fingerprints); *Commonwealth* v. *Davenport,* 462 Pa. 543, 342 A.2d 67 (1975) (evidence of blood type admissible where blood type evidence gained from second blood sample was derived from source independent of the illegality); *State* v. *Kelly,* 718 P.2d 385, 392 (Utah 1986) (suppression properly denied where source of search warrant was independently legal and unrelated to illegal impounding of premises).

In order to acquire the nontestimonial evidence, the state must overcome two hurdles. First, because the acquisition of the palm print, the blood sample and the saliva is a search; *Davis* v. *Mississippi,* 394 U.S. 721, 724, 89 S. Ct. 1394, 22 L. Ed. 2d 676 (1969) (fingerprints); *Schmerber* v. *California,* 384 U.S. 757, 766–72, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966) (blood); the fourth amendment requires that the state establish probable cause. Assuming this requirement is satisfied, the state must also meet the requirements of Practice Book § 776, namely, that "(1) the evidence sought may be of material aid in determining whether the defendant committed the offense charged; and (2) the evidence sought cannot practicably be obtained from other sources." The defendant claims that the state has failed to meet the fourth amendment requirement because the affidavit supporting the state's motions fails to support the necessary finding of probable cause. The defendant also claims that the state has failed to satisfy the requirements of § 776. We will address the defendant's claims seriatim.

## FOURTH AMENDMENT

The defendant claims that the affidavit fails to support a finding of probable cause as required by the fourth amendment. The defendant concedes that the first twenty-four paragraphs of the affidavit are untainted by the illegal arrest and can be used to support a finding of probable cause. The thrust of the defendant's

argument, however, is that the court erred in considering the information contained in paragraphs 25, 28, 33 and 35 because that information was tainted as a fruit of his illegal arrest and without this information the affidavit failed to support a finding of probable cause.

We first will address the defendant's claim as it relates to the information contained in paragraph 25, the defendant's confession to the state police, and paragraph 33, the fact of the defendant's conviction in the first trial. We held in *Ostroski II*, supra, that the confession to the state police was illegally obtained, overturned the conviction and remanded the case for a new trial. It is clear, then, that the use of this information to support the motions was improper. The state argues that the court did not rely on this information in making its decision on the motions. The transcript of the hearing reveals that the state included this information in the affidavit for "historical purposes," to set the averments in its motions in context, and *not* as a *basis* for its motions. Although we do not necessarily condone the state's practice of including such evidence in its affidavit for "historical purposes," we need not find error because that was done. Even if we were to determine that the court did consider this improper information as grounds for establishing probable cause, that alone would not be a basis for finding error in the court's decision to grant the state's motions. The correctness of the trial court's decision to grant the motions does not turn upon the presence of improperly obtained evidence in the affidavit. The trial court's decision is not erroneous, despite the presence of improperly obtained evidence in the affidavit, if the lawfully obtained evidence considered by itself is sufficient to establish probable cause. See *United States* v. *Driver*, 776 F.2d 807, 812 (9th Cir. 1985) (presence of tainted evidence in search warrant does not vitiate warrant when affidavit contains sufficient untainted infor-

mation); accord *United States* v. *Lancellotti,* 761 F.2d 1363, 1365 (9th Cir. 1985); *United States* v. *Johnson,* 690 F.2d 60, 63 (3d Cir. 1982), cert. denied, 459 U.S. 1214, 103 S. Ct. 1212, 75 L. Ed. 2d 450 (1983); *United States* v. *Mearns,* 443 F. Sup. 1244, 1254 (D. Del. 1978); see also *State* v. *Arpin,* 188 Conn. 183, 190–91, 448 A.2d 1334 (1982); 1 W. LaFave & J. Israel, Criminal Procedure § 9.4.

Our inquiry then turns to whether it was appropriate for the admission to Allen and the incriminating poem to be included in the affidavit supporting the motions. If this information was properly included in the affidavit, there is no question that the trial court was correct in making the necessary finding of probable cause.

The disposition of this issue necessarily turns on the application of the "fruit of the poisonous tree" doctrine, which requires courts to exclude evidence that is the product or "fruit" of police conduct in violation of the fourth amendment. *Wong Sun* v. *United States,* 371 U.S. 471, 484–88, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). Under *Wong Sun,* the question to be resolved concerning the admissibility of derivative evidence is whether, granting establishment of the primary illegality, the evidence to which the objection is made has been " 'come at by exploitation of [the initial] illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " Id., 488, quoting J. Maguire, Evidence of Guilt (1959) p. 221; *State* v. *Villafane,* 171 Conn. 644, 655, 372 A.2d 82 (1976), cert. denied, 429 U.S. 1106, 97 S. Ct. 1137, 51 L. Ed. 2d 558 (1977), overruled in part, *State* v. *Stepney,* 191 Conn. 233, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772, reh. denied, 466 U.S. 954, 104 S. Ct. 2163, 80 L. Ed. 2d 547 (1984). This standard reflects a deterrence based policy, which is "[t]he core rationale consistently advanced . . . for

extending the exclusionary rule to evidence that is the fruit of unlawful police conduct . . . ." *Nix* v. *Williams,* 467 U.S. 431, 442, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984); *State* v. *Derrico,* 181 Conn. 151, 157, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980).

United States Supreme Court decisions subsequent to *Wong Sun* have focused upon the attenuation aspect; at what point does the nexus between the fourth amendment violation and the challenged evidence, i.e., the admission to Allen and the poem, become so attenuated as to dissipate the taint of the primary illegality. See, e.g., *Brown* v. *Illinois,* 422 U.S. 590, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975); *Johnson* v. *Louisiana,* 406 U.S. 356, 92 S. Ct. 1620, 32 L. Ed. 2d 152 (1972); *State* v. *Villafane,* supra. The decision of the United States Supreme Court in *Brown* v. *Illinois,* supra, is instructive on the attenuation issue. In *Brown,* the police arrested the accused without probable cause. After the police had given him the warnings set forth in *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), Brown made two in-custody inculpatory statements. The trial court refused to suppress these statements, and Brown was convicted of murder. On appeal, the Supreme Court of Illinois upheld the conviction, determining that the giving of the *Miranda* warnings "served to break the causal connection between the illegal arrest and . . . the statements." *People* v. *Brown,* 56 Ill. 2d 312, 317, 307 N.E.2d 356 (1974). The United States Supreme Court reversed, holding that the Illinois court erred in adopting a per se rule that *Miranda* warnings, standing alone, purged the taint of an unlawful arrest and rendered postarrest statements admissible. *Brown* v. *Illinois,* supra, 603. The United States Supreme Court, however, declined to adopt a "but for" rule that would render inadmissible all statements given subsequent to an illegal arrest. Id. After stating that the *Miranda*

warnings are an important factor to be considered, the court adopted a case-by-case approach to determine whether evidence obtained after an illegal arrest has been purged of the taint of that illegality. Id. In addition to the giving of *Miranda* warnings, the court in *Brown* v. *Illinois,* supra, 603–604, identified three "relevant" factors to be considered in ascertaining whether a confession is obtained by the exploitation of an illegal arrest: (1) the "temporal proximity" of the illegality and the challenged evidence; (2) "the presence of intervening circumstances"; and (3) "particularly, the purpose and flagrancy of the official misconduct." See also *State* v. *McLucas,* 172 Conn. 542, 556, 375 A.2d 1014, cert. denied, 434 U.S. 855, 98 S. Ct. 174, 54 L. Ed. 2d 126 (1977); *State* v. *Villafane,* supra; see generally R. Pitler, " 'The Fruit of the Poisonous Tree' Revisited and Shepardized," 56 Cal. L. Rev. 579 (1968). These factors focus upon the causal relationship between the primary illegality, in this case the illegal arrest, and the evidence allegedly derived from this illegal conduct, and the actual purpose and flagrancy of the police conduct. See generally 1 W. LaFave & J. Israel, supra, § 9.4.

The defendant claims the admission to Allen is a fruit of the illegal arrest.[8] We disagree. Although we recog-

---

[8] The defendant argues that in *State* v. *Ostroski,* 186 Conn. 287, 440 A.2d 984, cert. denied, 459 U.S. 878, 103 S. Ct. 173, 74 L. Ed. 2d 142 (1982) (*Ostroski II*), we decided that the defendant's admission to Allen was a fruit of his illegal arrest. In support of this claim, the defendant points to the judge's ruling in the second trial that the admission to Allen was an inadmissible fruit of the illegal arrest. At the hearing on nontestimonial evidence, the state argued that this court did not pass upon the admissibility of the defendant's confession to Allen. The trial judge based his ruling on his reading of our decision in *Ostroski II*. The trial ruling was incorrect. Although we admit some possible ambiguity as to the scope of the terminology used in that opinion, our careful review of the records and briefs in *Ostroski II*, as well as the opinion itself, leads us to conclude that the issue of whether the admission to Allen was a fruit of the illegal arrest was not decided by this court in *Ostroski II*.

nize that "but for" the illegal arrest the defendant might not have been in a position to admit the crime to Allen, the United States Supreme Court has eschewed a "but for" rule. *Wong Sun* v. *United States,* supra, 487–88. We find the admission to Allen sufficiently attenuated from the primary illegality. The affidavit reflects significant intervening events which substantially broke the causal connection between the illegal arrest and the defendant's admission to Allen; *Taylor* v. *Alabama,* 457 U.S. 687, 697, 102 S. Ct. 2664, 73 L. Ed. 2d 314 (1982) (O'Connor, J., dissenting); *Brown* v. *Illinois,* supra, 603; see *State* v. *Jones,* 558 S.W.2d 233 (Mo. App. 1977), cert. denied, 435 U.S. 970, 98 S. Ct. 1609, 56 L. Ed. 2d 61 (1978); so as to remove the taint of the earlier fourth amendment violation. See, e.g., *United States* v. *Martinez-Gonzalez,* 686 F.2d 93, 98 (2d Cir. 1982); *State* v. *Young,* 191 Conn. 636, 651, 469 A.2d 1186 (1983). The statement to Allen did not come about by exploitation of the initial illegality but by " ' "means *sufficiently distinguishable* to be purged of the primary taint." ' " (Emphasis in original.) *Segura* v. *United States,* 468 U.S. 796, 804–805, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984), quoting *Wong Sun* v. *United States,* supra, 488. In deciding that the admission to Allen was not a "fruit of the poisonous tree," we have applied, as we must, the factors set forth by the United States Supreme Court in *Brown* v. *Illinois,* supra, 603–604. The burden of showing admissibility, of course, rests upon the state. Id., 604. In applying the factors set out by *Brown,* we considered whether there were events which broke the causal connection so that the defendant's statement to Allen was " ' "sufficiently an act of free will to purge the primary taint." ' " *Taylor* v. *Alabama,* supra, 690; *Brown* v. *Illinois,* supra, 602.

In this case, the illegal arrest by the state police occurred on April 17, 1977, and the statement to Allen

was made at 8:30 p.m. on April 19, 1977. Approximately thirty-six hours passed between the illegal arrest and the statement to Allen. During this period of time, the defendant was not only given his *Miranda* warnings, but, at 9 a.m., April 18, 1977, he was also presented before a Superior Court judge who advised him of his rights, and counsel was appointed to represent him. Moreover, and perhaps most important, the defendant's voluntary conduct in admitting the killing to his friend was not the product of police exploitation of any prior illegality but was a totally unexpected voluntary admission by the defendant. Allen was not an agent of the police, nor is there any claim that he was. See *State* v. *Alexander,* 197 Conn. 180, 496 A.2d 486 (1985). Allen had been the defendant's friend for a period of time prior to this episode. Under the circumstances of this case, we cannot say that the admission to Allen was " 'come at by exploitation of [the] illegality.' " *Wong Sun* v. *United States,* supra, 488.

The final relevant factor noted by the United States Supreme Court in *Brown* v. *Illinois,* supra, is the purpose and flagrancy of the official misconduct. This factor effectuates the deterrence policy of the exclusionary rule by providing an incentive for police to engage in lawful conduct. In this case, the illegality was not flagrant. This is shown, at least in part, by the three judge panel's finding of a legal arrest. Certainly the purpose of his continued detention was not to give the police the opportunity to have him make the challenged statement to Allen to whom no police connection is claimed. Nor was the purpose of the illegality to acquire a totally unexpected, voluntary admission by the defendant to his friend Allen.

Accordingly, a weighing of the above factors leads us to conclude that the admission to Allen was sufficiently attenuated from the illegal arrest so as not to conflict with the principal goal of the exclusionary

rule—the deterrence of future police misconduct. In this situation, there was no exploitation of any prior illegal police conduct but rather a reliance by the state, among other circumstances, on a voluntary admission by the defendant to a friend who was not a police agent. The admission to Allen was properly included in the affidavit.

Similarly, we find the poem written by the defendant to have been sufficiently attenuated from the initial illegality. In reaching this conclusion, we have reviewed the circumstances surrounding the source of this poem and how it came into the state's possession. At the time of the defendant's 1983 trial, Dennis Coyle had been a state trooper for about four years and prior to that time had served as a correctional officer at the Hartford correctional center from December, 1976, to January, 1979. As a correctional officer, he met the defendant at the Hartford jail and saw him "pretty much on a daily basis" and "spoke with him on occasions," although it was not a "friendship per se." At that time, there was a weekly publication put out by the inmates that contained such information as sports, news, puzzles, etc. In the November 10, 1978 edition of that paper Coyle read a poem that the defendant had written and he was "impressed by it." There was no signature on it, but the defendant's name was typed on the poem. One day in November, 1978, "right after [the poem] was published," Coyle told the defendant that he thought it was a "pretty good poem" and the defendant said, "Thanks." Coyle took a copy home and kept it. In the summer of 1982, Coyle was attending a constitutional law seminar where the case was discussed. A couple of months before the 1983 trial at which Coyle testified, he contacted the prosecutor in this case and informed him that he had a copy of the poem. During his testimony, Coyle produced the copy he had retained as well as a copy of the jail newspaper

in which the poem was printed. The latter was secured as a result of the service of a subpoena at the Hartford correctional center. The poem was admitted as an exhibit at the hearing on the nontestimonial evidence motions. The poem had been written more than a year after the defendant's illegal arrest. Between the illegal arrest and the publication of the poem, the defendant was represented by counsel, had numerous court dates and had been fully advised of his rights prior to testifying at his first trial. Indeed, the wording of the poem itself strongly suggests that the defendant wrote the poem not because of his illegal arrest or his ensuing confession but because of his desire to educate the young on the vices of drugs. The state did not acquire the poem by exploitation of the illegal arrest, but rather, the poem was a voluntary act of the defendant wholly distinct from the illegal arrest. Inclusion of the poem in the affidavit was proper. See *Brown* v. *Illinois,* supra; *State* v. *Villafane,* supra.

### PRACTICE BOOK § 776

The defendant also argues that the state has failed to meet the requirements of Practice Book § 776. The defendant's argument is three pronged. First, the defendant argues that because his arrest was without probable cause, he was not a "defendant" as that term is used in § 776 and thus, the Practice Book provision could not have been used to obtain evidence from him. Second, the defendant argues that the state has failed to establish that the evidence sought, the palm print, the blood and the saliva, could not "practicably be obtained from other sources." Third, the defendant argues that the state has failed to establish that the evidence would be of "material aid" in determining whether the defendant committed the offense charged. We are not persuaded.

We do not agree with the defendant's argument that § 776 could not be applied to him because his very status as a defendant was based on an illegal arrest. While the defendant's illegal arrest resulted in the suppression at trial of evidence seized incident thereto, it did not alter the ability of the state to establish the existence of probable cause to justify holding the defendant to respond to charges against him. See *State* v. *Fleming,* 198 Conn. 255, 502 A.2d 886, cert. denied, 475 U.S. 1143, 106 S. Ct. 1797, 90 L. Ed. 2d 342 (1986).

The defendant's next argument is that the state failed to demonstrate that the evidence sought could not "practicably be obtained from other sources." The defendant argues that because the state already had in its possession the nontestimonial evidence it sought, i.e., a palm print and blood sample derived from the illegal arrest, it could "obtain" the very same evidence from another "source." By this argument the defendant is attempting to reap the benefit of the exclusionary rule while at the same time expanding its scope to foreclose the state from obtaining like evidence through an untainted source. We recognize that once evidence is suppressed, it is no longer available to the state on the question of guilt. In *Ostroski II,* supra, 294–95, we held that the physical evidence seized as a result of the defendant's unlawful arrest, inter alia, the defendant's palm print and blood sample obtained at the time of arrest, was inadmissible in evidence. The defendant cannot now avail himself of that ruling while at the same time argue that the state is in possession of that evidence for purposes of this motion. The defendant himself is not a "suppressible fruit" and the earlier illegality cannot deprive the state of the opportunity to prove his guilt through evidence wholly untainted by prior police misconduct. *United States* v. *Crews,* 445 U.S. 463, 474, 100 S. Ct. 1244, 63 L. Ed. 2d 537 (1980). Because of our ruling in *Ostroski II,* the nontestimonial

evidence sought by the state could not have been "practicably obtained from other sources."

Little explanation is necessary to demonstrate that, under the circumstances of this case, the nontestimonial evidence was of "material aid in determining whether the defendant committed the offense charged." We previously have stated that this requirement is " 'met if the prosecutor has *any* basis for tying the particular evidence sought to the case.' " (Emphasis added.) *State v. Acquin,* 177 Conn. 352, 354, 416 A.2d 1209 (1979), quoting Unif. R. Crim. P. 434 (a), 10 U.L.A. 156 (1974). In this case, the state had a palm print taken at the scene of the crime. The victim's blood type was known and blood believed to be that of the assailant was found at the scene. Obtaining the defendant's palm print and blood type, through a blood or saliva sample, in a manner untainted by the illegal arrest clearly was a "material aid in determining whether the defendant committed the offense charged."

## II

In his second claim of error, the defendant claims that the trial court should have granted his motion to dismiss and his motion to dismiss the indictment.[9] This claim has two components: first, that his arrest was illegal because the probable cause which supported it was based in part on evidence tainted by his unlawful seizure on April 16, 1977; see *Ostroski II,* supra; and second, that because his arrest was illegal, the defendant's presentment to the grand jury, the indict-

---

[9] Contrary to the state's claim that this issue cannot be reviewed by us because it entails the use of the transcript of the grand jury proceedings which is unauthorized; see General Statutes § 54-45a; the disposition of this issue does not entail the use of that transcript. Moreover, *United States v. Mechanik,* 475 U.S. 66, 106 S. Ct. 938, 89 L. Ed. 2d 50 (1986), likewise presents no effective bar to our review of this issue given the narrow holding of *Mechanik* in deciding a claimed violation of rule 6 (d) of the Federal Rules of Criminal Procedure.

ment, and the subsequent prosecution should have been barred. Although the state concedes that the defendant's arrest was illegal, it contends that under both federal and state constitutional law this illegality does not affect the jurisdiction of the court, provide a ground for dismissing the indictment, or preclude trial and conviction for the offense.

The relationship between an illegal arrest and a subsequent prosecution under federal constitutional law is well settled. The federal case law is clear that an illegal arrest will not bar a subsequent prosecution or void a resulting conviction. *I.N.S.* v. *Lopez-Mendoza,* 468 U.S. 1032, 1036, 104 S. Ct. 3479, 82 L. Ed. 2d 778 (1984); *United States* v. *Crews,* supra; *Gerstein* v. *Pugh,* 420 U.S. 103, 119, 95 S. Ct. 854, 43 L. Ed. 2d 54 (1975); *United States* v. *Blue,* 384 U.S. 251, 255, 86 S. Ct. 1416, 16 L. Ed. 2d 510 (1966); *Frisbie* v. *Collins,* 342 U.S. 519, 522, 72 S. Ct. 509, 96 L. Ed. 541, reh. denied, 343 U.S. 937, 72 S. Ct. 768, 96 L. Ed. 1344 (1952); *Ker* v. *Illinois,* 119 U.S. 436, 440, 7 S. Ct. 225, 30 L. Ed. 421 (1886).[10] Federal law, then, provides no basis for the defendant's argument that his motions to dismiss should have been granted.

If the defendant's claim that his illegal arrest requires dismissal of the charges against him is to be sustained, that claim must find its predicate in state law. The state contends that the defendant's claim in this case is

---

[10] As the court stated in *United States* v. *Blue,* 384 U.S. 251, 255, 86 S. Ct. 1416, 16 L. Ed. 2d 510 (1966): "Our numerous precedents ordering the exclusion of such illegally obtained evidence assume implicitly that the remedy does not extend to barring the prosecution altogether. So drastic a step might advance marginally some of the ends served by exclusionary rules, but it would also increase to an intolerable degree interference with the public interest in having the guilty brought to book."

In some cases, prosecution may effectively be foreclosed by the absence of the challenged evidence. But this contemplated consequence is the product of the exclusion of specific evidence tainted by the fourth amendment violation and is not the result of a complete bar to prosecution.

indistinguishable from the claim presented to this court in *State* v. *Fleming,* supra, 262–63. The defendant, on the other hand, recognizing the applicability of *Fleming,* claims that in *Fleming* we specifically distinguished *State* v. *Federici,* 179 Conn. 46, 425 A.2d 916 (1979), thus leaving open a situation where the charges would indeed be dismissed. The defendant claims that this case is parallel to *Federici,* thus his motions to dismiss should have been granted. We disagree.

In *State* v. *Fleming,* we overruled *State* v. *Licari,* 153 Conn. 127, 214 A.2d 900 (1965). *Licari* held that an illegal arrest per se invalidates a subsequent conviction. In *State* v. *Fleming,* supra, 263, we held that "[w]here the fairness of a subsequent prosecution has not been impaired by an illegal arrest, neither the federal nor the Connecticut constitution requires dismissal of the charges or a voiding of the resulting conviction."[11] We specifically excluded from our holding, however, cases such as *Federici* where the fairness of the defendant's trial is compromised by the circumstances of his arrest. Id., 262. In distinguishing *Federici,* we stated that "[a]n illegal arrest may impair the fairness of a subsequent prosecution only where evidence obtained as a direct consequence of that arrest is admitted against the defendant at trial." *State* v. *Ryerson,* 201 Conn. 333, 338, 514 A.2d 337 (1986). *State* v. *Federici,* supra. The defendant argues that because illegally obtained evidence, the palm print, the blood sample, and the saliva sample, was introduced at his 1983 trial, *Federici* mandates that his motions to dismiss should have been granted.

The defendant's reliance on the *Federici* exception to our holding in *Fleming* is misplaced. As was devel-

---

[11] In *State* v. *Ryerson,* 201 Conn. 333, 339, 514 A.2d 337 (1986), we held that our decision in *State* v. *Fleming,* 198 Conn. 255, 502 A.2d 886 (1986), is to be applied retroactively.

oped in Part I of this opinion, illegally obtained evidence was not in fact admitted at trial; that is, the blood, the saliva, and the palm print which were admitted at trial, all of which the defendant claims are "fruits" of his illegal arrest, are not fruits, in that the evidence was obtained by means " 'sufficiently distinguishable to be purged of the primary taint.' " *Brown* v. *Illinois,* supra, 599; *Wong Sun* v. *United States,* supra, 487–88; see *Bynum* v. *United States,* supra. Therefore, the factual predicate of the *Federici* type exception to our holding in *Fleming* does not exist in this case. The fairness of the defendant's 1983 trial was not impaired by his illegal arrest. Cf. *State* v. *Federici,* supra. As we have stated, the defendant is not himself a "suppressible fruit," and the illegality of his arrest cannot deprive the state of the opportunity to prove his guilt through introduction of evidence at trial which is untainted by the prior police misconduct. *State* v. *Fleming,* supra; see *United States* v. *Crews,* supra. The trial court did not err in denying the defendant's motions to dismiss.

## III

The defendant's third claim of error is that the trial court erred in denying the defendant's request to charge the jury on the lesser included offense of manslaughter as defined in General Statutes § 53a-55 (a) (1) and (3).[12] The defendant timely filed his request to charge prior to closing arguments, and took an exception when the charge was not given.

"In *State* v. *Whistnant,* 179 Conn. 576, 588, 427 A.2d 414 (1980), this court articulated a four pronged test

[12] General Statutes § 53a-55 (a) (1) and (3) provides: "(a) A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person . . . or (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person."

for determining when it is proper to charge a jury with respect to a lesser included offense. 'A defendant is entitled to an instruction on a lesser offense if, and only if . . . (1) an appropriate instruction is requested by either the state or the defendant; (2) it is not possible to commit the greater offense, in the manner described in the information or bill of particulars, without having first committed the lesser; (3) there is some evidence, introduced by either the state or the defendant, or by a combination of their proofs, which justifies conviction of the lesser offense; and (4) the proof on the element or elements which differentiate the lesser offense from the offense charged is sufficiently in dispute to permit the jury consistently to find the defendant innocent of the greater offense but guilty of the lesser.' " *State* v. *Manley,* 195 Conn. 567, 574, 489 A.2d 1024 (1985), quoting *State* v. *Vass,* 191 Conn. 604, 616–17, 469 A.2d 767 (1983); *State* v. *McIntosh,* 199 Conn. 155, 158, 506 A.2d 104 (1986).

The defendant argues that he has established all four prongs of *Whistnant* and thus, the trial court erred in refusing to instruct the jury with respect to the lesser included offense of manslaughter. The state, on the other hand, argues that the defendant has failed to meet even the first prong of *State* v. *Whistnant.*[13]

"We have previously considered and rejected the claim 'that a defendant has a fundamental constitutional right to a jury instruction on a lesser included offense.' [*State* v. *Whistnant,* supra,] 581. The right to such an instruction is purely a matter of our common law as set forth in *Whistnant* itself. The first prong of *Whistnant* requires that the defendant request 'an appropriate instruction.' A proposed instruction on a

[13] The state also argues that the defendant has failed to meet the third and fourth prongs of *State* v. *Whistnant,* 179 Conn. 576, 588, 427 A.2d 414 (1980). Because we hold that the defendant failed to request an appropriate instruction, we need not address these claims.

lesser included offense, like any other proposed jury instruction is not appropriate unless made in compliance with Practice Book § 852." *State* v. *McIntosh,* supra, 158. Section 852 provides in pertinent part: "Requests shall be in separate and numbered paragraphs, each containing a single proposition of law *clearly and concisely stated with the citation of authority upon which it is based, and the facts supported by the evidence to which the proposition would apply.  . . ."* (Emphasis added.)

In the present case, the defendant framed his request to charge as follows: "In accordance with *State* v. *Whistnant,* 179 Conn. 576, [427 A.2d 414 (1980),] and *State* v. *Maselli,* 182 Conn. 66, [437 A.2d 836 (1980), cert. denied, 449 U.S. 1083, 101 S. Ct. 868, 66 L. Ed. 2d 807 (1981)], the defendant requests the Court to charge on the following lesser included offenses; Manslaughter in the First Degree, Sections 53a-55 (a) (1) and 53a-55 (a) (3) of the General Statutes." A summary request such as this one does not comply with our rules of practice.

In this written request, the defendant merely asked the court to instruct the jury, in pertinent part, that it could consider the lesser offense of manslaughter in the first degree. "[A]n 'appropriate instruction' under *State* v. *Whistnant* must contain ' "a complete statement of the essential facts as would have justified the court in charging in the form requested." *Michaud* v. *Gagne,* 155 Conn. 406, 410, 232 A.2d 326 (1967), quoting *Dwyer* v. *Connecticut Co.,* 103 Conn. 678, 680, 131 A. 838 (1925).' *State* v. *Killenger,* 193 Conn. 48, 57, 475 A.2d 276 (1984)." *State* v. *McIntosh,* supra, 160. The defendant's request contains no facts at all. Moreover, although the request cites *State* v. *Whistnant* as authority for the proposition stated, we have emphasized in the past that *Whistnant* by itself does not provide the substantive principles of criminal law which would jus-

tify any particular instruction. *State* v. *McIntosh,* supra. While this court does not favor unyielding adherence to "rules of procedure where the interests of justice are thereby disserved"; id.; the ever increasing refinement of our law justifies cooperation of counsel in stating requests for jury instruction. "The minor burden of cooperation imposed by this section is neither unreasonable nor novel." Id., 161. The trial court did not err in refusing the defendant's request to instruct the jury on the elements of General Statutes § 53a-55 (a) (1) and (3).

## IV

The defendant's fourth claim of error is that he was denied effective assistance of counsel. In light of our holding in *State* v. *Leecan,* 198 Conn. 517, 504 A.2d 480, cert. denied, 476 U.S. 1184, 106 S. Ct. 2922, 91 L. Ed. 2d 550 (1986), we need not address this claim.

There is no error.

In this opinion the other justices concurred.