STATE OF CONNECTICUT *v.* WILLIAM DAUGAARD
(10709)

DUPONT, C. J., DALY and SCHALLER, Js.

Argued June 1—decision released August 17, 1993

*Brian S. Carlow,* assistant public defender, for the appellant (defendant).

*John A. East III,* deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *Mary Elizabeth Baran,* assistant state's attorney, for the appellee (state).

DUPONT, C. J. The defendant appeals from a judgment of conviction, rendered after a jury trial, of one count of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1). He claims that (1) the state's suppression of allegedly material evidence favorable to him violated his constitutional right to a fair trial, (2) the trial court abused its discretion by denying his request for a continuance so that he could subpoena the victim to testify, (3) the trial court improperly admitted evidence that was obtained pursuant to an illegal warrantless arrest, and (4) the trial court improperly admitted testimony detailing the defendant's invocation of various constitutional rights. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. At approximately 11 p.m. on May 30, 1990, the victim was sitting on the front steps of her apartment building in West Haven when Michael Murray, Kristen Anderson and the defendant arrived in the defendant's car. Murray lived in the same building and he and Anderson were friends of the victim, but the defendant was unknown to the victim.

Murray invited the victim to his apartment, and the four drank there until the liquor they had was consumed. The victim then said that she knew the location of an after-hours club where they could purchase more. The defendant and the victim left to purchase liquor. The defendant told the victim that he wanted to drive because the car belonged to his sister and was not registered.

When the victim noticed that the defendant was ignoring her directions, she became frightened and demanded that the defendant drive her back to Murray's apartment. The defendant told the victim that "she wasn't going anywhere" and that he was "taking her to Las Vegas to be a prostitute." The defendant then punched the victim in the face and forced her head under the dashboard so that she was unable to see where they were going, although she was able briefly to see a highway sign that read "Wallingford-North Haven."

The victim testified that eventually the defendant drove the car off the highway to a secluded spot down a small, narrow road lined with tall weeds. The victim testified that she could see cars on the highway nearby, but that the area where the car had stopped was secluded and that there was no way that she could escape. The defendant pulled the victim into the backseat of the car and sexually assaulted her. After the attack, the defendant allowed the victim to leave the car and she walked to the highway and hitchhiked back to the apartment building.

Upon arriving at Murray's apartment, the victim related details of the attack to Anderson and Murray, who called the West Haven police department. A West Haven police officer took the victim to Yale-New Haven Hospital where she was examined by several physicians. The victim was then interviewed at the hospital by Detectives Theodore Milewski and Patricia Miranda of the Wallingford police department. After the victim was released from the hospital, the detectives twice unsuccessfully attempted to ascertain the location of the attack by driving around the New Haven area with the victim.

The morning following the assault, the West Haven police received a call from the defendant's sister com-

plaining that the defendant had taken her car without her permission on the previous evening. The West Haven police arrested the defendant, without a warrant, at his sister's house where he lived, and charged him with using his sister's car without permission in violation of General Statutes § 53a-119b. Later, while the defendant was incarcerated at the West Haven police station in connection with the car theft, detectives from the Wallingford police department interviewed him in connection with their investigation of the sexual assault.

I

The defendant's first claim is that the state withheld favorable and material evidence from him, thus violating his constitutional right to a fair trial. Related to this claim is the defendant's assertion that the trial court abused its discretion by denying his request for a continuance so that he could subpoena the victim to testify as a defense witness regarding the evidence that the state allegedly withheld from him. Both parties agree that the two claims are interrelated, and we, therefore, will consider them together.

Prior to trial, the defendant moved to compel the state to disclose all exculpatory information and materials. The motion was granted and the state turned over numerous documents to the defendant. Later, at the conclusion of the victim's direct testimony at trial, the state gave the defendant a copy of the victim's formal statement as required by General Statutes § 54-86b and Practice Book § 752.[1] The defendant then conducted a voir dire examination of the victim to determine whether any discoverable materials existed in addition

[1] General Statutes § 54-86b provides: "(a) In any criminal prosecution, after a witness called by the prosecution has testified on direct examination, the court shall on motion of the defendant order the prosecution to produce any statement oral or written of the witness in the possession of

to those already disclosed. After voir dire, the defendant served a subpoena on the Wallingford police department seeking all police reports prepared in the course of their investigation. In response, the requested reports, including two narrative reports prepared by Miranda, were delivered to the court, which ordered that they be sealed and marked as a court's exhibit.

The defendant requested that the court, *Ripley, J.*, conduct an in camera review of the sealed reports in order to ascertain whether the defendant was entitled to any of them pursuant to the court's earlier discovery order. The court refused. The trial continued, and the defendant conducted an extensive cross-examination of the victim. Upon completion of her testimony, the victim returned to California where she had relocated after the incident.

The state proceeded to present its case, including testimony by Miranda. At the completion of Miranda's direct testimony, the state provided the defendant with two narrative reports Miranda had prepared. The first of these reports, defense exhibit eleven for identification, comprises the basis of the defendant's claims.[2] Miranda's report states that while she and Milewski

the prosecution which relates to the subject matter as to which the witness has testified, and the court shall order said statement to be delivered directly to the defendant for his examination and use.

"(b) If the prosecution fails to comply with the order of the court, the court shall strike from the record the testimony of the witness and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared."

Practice Book § 752 provides: "After a witness called by the state has testified on direct examination at trial, the judicial authority shall, on motion of the defendant, order the state to produce any statement of the witness in the possession of the state or its agents, including state and local law enforcement officers, which statement relates to the subject matter about which the witness has testified."

[2] Exhibit eleven was also included in court's exhibit one, which had been sealed by the court. The defendant's exhibit eleven was marked for identification but was never admitted into evidence.

were driving around with the victim on the morning following the assault in an attempt to locate the scene of the assault, the victim "mentioned that she believed the location of the sexual assault was in a rest area off the highway, which had a tourist information center."

After receiving the report, the defendant moved to compel the state to produce the victim and to reopen her cross-examination, claiming that the victim's description of the location of the assault, as related in Miranda's report, contradicted the victim's testimony on direct examination[3] and the description in her formal statement.[4] The court denied the motion. The

---

[3] On direct examination, the victim testified:

"Q. Did there come a time when the car left the highway that you were on?

"A. Yes.

"Q. Can you tell us what the area looked like?

"A. I remember pulling into a small, narrow road, I guess he pulled into weeds. It was very secluded.

\* \* \*

"Q. You left the highway and went into that area?

"A. Yes.

"Q. Can you see any cars from where you were?

"A. There was a hill with the highway on the left side. I could see cars were going by, but the road that went near the weeds, there was no cars. It was secluded. I don't think that road was even used that I could see.

"Q. But you could see the cars on the highway from where you were?

"A. Yes.

"Q. Were they close enough to get the attention of someone?

"A. No. There was like a hill and the cars on the highway I was able to see, but I wouldn't be able to get anyone's attention from where I was.

"Q. Were there any other cars or people in this area?

"A. No.

"Q. Can you describe the area for us?

"A. It was like a swamp. There were tall, five foot weeds.

"Q. Was it a quiet area or was there a lot of activity?

"A. It was quiet.

"Q. During this time that you were there, did you see any other cars go by?

"A. Not on that road, only the highway."

[4] The victim's formal statement provides in relevant part: "After he got off the highway, he drove down a sort of dirt, one way road that was deserted and that had grass on the right. Let me add that before he drove off the highway, Bill passed a truck rest area. The one way road that we

defendant then moved for a continuance so that he could subpoena the victim and present her as part of his case. This motion was also denied. The defendant was permitted, however, to cross-examine Miranda regarding the victim's statement that the location of the assault was "in a rest area off the highway." In response to defense questioning, Miranda testified that her report was in error and that the victim had told her that the attack had taken place "near" a rest area, not "in" a rest area as stated in her report.

## A

We first address the defendant's contention that his due process rights were violated by the state's suppression of material evidence favorable to him after he specifically requested it. It is well established that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady* v. *Maryland,* 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *Demers* v. *State,* 209 Conn. 143, 149, 547 A.2d 28 (1988); *State* v. *Pollitt,* 205 Conn. 132, 141, 531 A.2d 125 (1987). To establish a *Brady* violation, the defendant has the burden of demonstrating (1) that the state suppressed evidence after a request by the defense, (2) that the evidence was favorable to the defense, and (3) that the evidence was material. *Moore* v. *Illinois,* 408 U.S. 786, 794–95, 92 S. Ct. 2562, 33 L. Ed. 2d 706 (1972); *State* v. *Rasmussen,* 225 Conn. 55, 90, 621 A.2d 728 (1993); *State* v. *Shannon,* 212 Conn. 387, 398, 563 A.2d 646, cert. denied, 493 U.S. 980, 110 S. Ct. 510, 107 L. Ed. 2d 512 (1989); *Demers* v. *State,* supra, 150. "To prevail

were on had a large field of grass on the left. If you looked up to the right a little, you could see cars. Some of the grass on the left was high. Bill parked the car in the field on the left. However, the car could be seen from the road, but no cars went by."

on a claimed violation of *Brady* and its progeny, a defendant must establish each of these three prongs." *State* v. *Green,* 194 Conn. 258, 263, 480 A.2d 526 (1984), cert. denied, 469 U.S. 1191, 105 S. Ct. 964, 83 L. Ed. 2d 969 (1985).

It is undisputed that Miranda's report was provided to the defense at the completion of her direct testimony. The defendant concedes that disclosures made at trial may comport with constitutional requirements under certain circumstances, but argues that disclosure must be made at a time when it can effectively be used at trial. The defendant contends that because the report was not disclosed prior to the victim's return to California, he was precluded from effectively utilizing the report.[5] We agree with the defendant that due process requires *Brady* material to be disclosed to the defendant in such a manner that he may effectively utilize it at trial.

"The circumstance that claimed *Brady* material was disclosed *during,* and not *after,* trial hardly precludes the application of *Brady* which declared the right to material and favorable evidence as part of the fundamental right to a fair trial. . . . *Brady*'s due process basis, therefore, requires a determination of when disclosure must be made to ensure a fair trial. . . . The unmistakable tone of *Brady* is that evidence required to be disclosed must be disclosed at a time when it can be used. . . . No denial of due process occurs if *Brady* material is disclosed . . . in time for its effective use at trial." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Pollitt,* 199 Conn. 399, 413–14, 508 A.2d 1 (1986); *State* v. *Harris,* 32 Conn. App. 476, 479, 629 A.2d 1166 (1993).

---

[5] The defendant makes no claim that the state failed to comply with General Statutes § 54-86b or Practice Book § 752.

Thus, in cases where the evidence is disclosed during trial, "the defendant can complain only of the timing of the disclosure and has no basis for a claim of suppression." *State* v. *Reddick,* 197 Conn. 115, 121, 496 A.2d 466 (1985), cert. denied, 474 U.S. 1067, 106 S. Ct. 822, 88 L. Ed. 2d 795 (1986); accord *State* v. *Rasmussen,* supra, 91. The defendant therefore appropriately acknowledges that "[u]nder these circumstances, [he] bears the burden of proving that he was prejudiced by the state's failure to make the information available to him at an earlier time. . . . The appropriate standard to be applied in a case such as this is whether the disclosure came so late as to prevent the defendant from receiving a fair trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Reddick,* supra, 121–22; *State* v. *Harris,* supra. In making this determination, "[t]he focus is not on the fact of nondisclosure, but the impact of the nondisclosure on the jury's verdict. . . . The effect then of disclosable evidence should be viewed in terms of its likely effect upon those on whom the outcome rests—the jury." (Citations omitted.) *State* v. *Pollitt,* supra, 199 Conn. 414. We conclude that the disclosure of the police report after the victim had left Connecticut did not constitute a violation of the defendant's due process rights.

The defendant argues that the "tardy" disclosure of Miranda's report was prejudicial to him because he was unable to cross-examine the victim regarding the alleged inconsistencies in her testimony at trial, her formal statement and the statement in Miranda's report concerning the location of the assault. The defendant claims that, although the location of the assault was not at issue, the victim's credibility was, and he was denied the opportunity to attack the victim's credibility by means of the "inconsistent" statement. The statement in the police report, however, was not substantially contradictory to the victim's trial testimony

or her formal statement. Additionally, any inconsistency was adequately presented to the jury during the defendant's cross-examination of Miranda.

The defendant also had ample opportunity to cross-examine the victim as to all of the details of the assault, including the location where the assault transpired. The defendant's cross-examination of the victim was extensive, covering parts of three days and consisting of approximately 133 pages of transcript. During that cross-examination, as on direct examination, the victim consistently testified that the defendant had pushed her under the dashboard of the car and that she did not know the location of the assault. The victim was also thoroughly cross-examined as to the area surrounding the location of the assault. We cannot conclude, therefore, that the timing of the disclosure of Miranda's report so prejudiced the defendant that he was deprived of a fair trial.

We also determine that the defendant has not met his burden of proving that the report was "favorable" to him in a constitutional sense. "Favorable evidence is that evidence which . . . might have led the jury to entertain a reasonable doubt about guilt." (Internal quotation marks omitted.) *State* v. *Green,* supra, 265. The statement of the victim in the police report does not constitute substantive exculpatory evidence because, by itself, it does not demonstrate the defendant's innocence or necessarily give rise to reasonable doubt as to the defendant's guilt. The defendant asserts, however, that the statement has impeachment value and correctly points out that favorable evidence under *Brady* is not limited to exculpatory evidence but also includes impeachment evidence. *United States* v. *Bagley,* 473 U.S. 667, 676, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985); *State* v. *Shannon,* supra, 399.

The police report is not in direct contradiction to the victim's testimony or her formal statement. The inconsistency between the report and the statement was explained by Miranda on cross-examination. Any inconsistency between the statement contained in the report and the victim's testimony or formal statement was not so substantial as to "alter the jury's judgment of the credibility of a crucial prosecution witness." *State* v. *Green,* supra, 266. The evidence would not have led the jury to entertain a reasonable doubt about the defendant's guilt, either because of its evidentiary value[6] or because the victim's credibility would be severely damaged. We conclude that the statement was not "favorable" to the defendant within the meaning of *Brady* and its progeny.

Similarly, we also conclude that the evidence was not "material" as defined by *Brady* and its progeny. Materiality is determined by an examination of the entire record. Id., 265. "The evidence is material only .if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States* v. *Bagley,* supra, 682; *State* v. *Rasmussen,* supra, 92. The defendant argues that where "a conviction depends entirely upon the testimony of certain witnesses . . . information affecting their credibility is material in the constitutional sense . . . since if they are not believed a reasonable doubt of guilt would be created. . . ." (Citations omitted; internal quotation marks omitted.) *Demers* v. *State,* supra, 161–62.

The statement in Miranda's report was not substantially inconsistent with the victim's testimony or for-

---

[6] The defendant did not attempt to introduce the police report into evidence.

mal statement and, consequently, its impeachment value was extremely limited. The victim's testimony was unequivocally that the defendant had raped her. The particular site of the car at the time of the rape was of much less significance. Moreover, there was substantial evidence, including physical evidence and corroborating testimony, to support the jury's finding. After carefully reviewing the record and the entire trial transcript, we conclude that there is not a reasonable probability that, had the report been disclosed to the defendant prior to the victim's return to California, the result of the trial would have been different.

### B

The defendant also claims that the trial court abused its discretion in denying his request for a continuance for the purpose of subpoenaing the victim to compel her to return to Connecticut to testify as part of the defense case regarding the alleged inconsistencies between her testimony and the statement in Miranda's report. "Whether the tardy disclosure of *Brady* material fairly requires a continuance or a delay in order to make effective use of such matter is essentially a factual question in each case." *State* v. *Pollitt,* supra, 199 Conn. 414. "The law is clear that requests for continuances are matters of judicial discretion and that on review every reasonable presumption in favor of the trial court's discretionary ruling will be made. . . . There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. . . . Rather, the answer must be found in the particular facts of each individual case. . . . The party seeking the continuance has the burden of establishing good cause for such a continuance." (Citations omitted; internal quotation marks omitted.) *State* v. *Haye,* 214 Conn. 476, 483, 572 A.2d 974 (1990); see also *State* v. *McKnight,* 191 Conn. 564, 576–77, 469 A.2d 397 (1983).

On the basis of our earlier determination that the state did not improperly suppress Miranda's report, we conclude that the trial court did not abuse its discretion in denying the continuance.

## II

The defendant's last two claims relate to events that transpired subsequent to the defendant's warrantless arrest by the West Haven police and during the time that the defendant was being interviewed at the West Haven police station by the Wallingford detectives. Prior to trial, the defendant moved to suppress any statements made by him to Milewski and Wallingford Detective Patrick Shanley on the ground that they were the inadmissible fruits of an illegal arrest. The defendant also moved to suppress any testimony that was to be offered at trial by Milewski and Shanley regarding the defendant's invocation of his constitutional rights. The motions were denied after a hearing by the suppression court, *Flanagan, J.* The statements, as well as testimony regarding the defendant's invocation of his constitutional rights, were subsequently admitted at trial.

On the morning following the sexual assault, the defendant was arrested without an arrest warrant by the West Haven police at his sister's house, where he lived. He was charged with using his sister's car without her permission. There was no evidence to indicate that there was consent to the entry or emergency circumstances that would provide justification for entry into the house. The defendant was taken to the West Haven police station and incarcerated. Sometime around noon, the Wallingford police department was notified that the defendant was at the West Haven police station. At approximately 6:30 p.m., Milewski and Shanley arrived from Wallingford to interview the defendant in connection with their investigation of the sexual assault.

At the suppression hearing, the testimony of Shanley and Milewski was substantially similar. They testified that upon arriving at the West Haven police station, they introduced themselves to the defendant and explained that he had been implicated in a sexual assault that they were investigating. The defendant responded: "It didn't happen, man." Milewski then read the defendant his rights as required by *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). This was the only statement made before the defendant's rights were read. The defendant indicated that he understood his rights, but he refused to waive them, stating that he would not give up anything. The defendant asked when the attack had occurred. After hearing the answer, the defendant stated that "it couldn't have happened that way" because he had been at a local bar with several other people from 7 p.m. until closing and that when he left the bar he "was too drunk to remember what he did later."

The detectives asked the defendant if he would consent to a search of his body, and provide them with hair, blood and saliva samples. The defendant again invoked his constitutional rights, indicating that he would not submit to such a search unless the police obtained a search warrant. The defendant was then asked if he knew a girl with the victim's first name, to which the defendant replied that he wanted to speak with an attorney. At that point, the detectives terminated the interview and placed the defendant under arrest for sexual assault, kidnapping and unlawful restraint. One of the motions to suppress concerns the statements that "It didn't happen" and that he had been at a bar until it closed and that when he left he was too drunk to remember what happened later. The other motion to suppress concerns the statements involving the defendant's constitutional rights.

## A

The defendant's first motion to suppress "lies at the crossroads of the Fourth and the Fifth Amendments." *Brown* v. *Illinois,* 422 U.S. 590, 591, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975). The defendant argues that any statements he made to Milewski and Shanley while he was incarcerated at the West Haven police station should have been suppressed at trial because the statements were obtained pursuant to an illegal warrantless arrest in violation of the fourth amendment. The defendant's statements were inculpatory and involved the fifth amendment. The defendant argues that under the doctrine commonly and colorfully known as "the fruit of the poisonous tree," any evidence obtained by the Wallingford detectives as a result of the illegal arrest by the West Haven police must be suppressed.

The question to be resolved is whether the statements were obtained by the exploitation of the illegality arising from the initial, warrantless arrest by the West Haven police or whether any taint on the statements was purged by attenuating and intervening circumstances. We conclude that the suppression court properly refused to suppress the defendant's statements, and that they were properly admitted at trial.

The "fruit of the poisonous tree" doctrine "requires courts to exclude evidence that is the product or 'fruit' of police conduct in violation of the fourth amendment."[7] *State* v. *Ostroski,* 201 Conn. 534, 545, 518 A.2d 915 (1986); *Segura* v. *United States,* 468 U.S. 796, 804–805, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984); *Wong Sun* v. *United States,* 371 U.S. 471, 484–88, 83 S. Ct.

---

[7] There is no dispute that this doctrine applies with equal force to statements derived from an unauthorized arrest as it does to physical, tangible materials seized pursuant to an unlawful search. *Wong Sun* v. *United States,* 371 U.S. 471, 485–86, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963).

407, 9 L. Ed. 2d 441 (1963). The suppression court did not hear evidence regarding the details of the initial arrest and it failed to determine specifically whether the arrest was illegal. The record is devoid, therefore, of any details of that arrest, including whether the defendant was actually living with his sister at that time, whether she or another member of the household with authority consented to the police entry onto the premises, or whether there were exigent or emergency circumstances. We need not remand the case for a determination of this issue, however, because we determine that even if the initial arrest was illegal, any taint on the statements subsequently made by the defendant to the detectives was purged by intervening circumstances. See *State* v. *Cates,* 202 Conn. 615, 619, 522 A.2d 788 (1987) (holding that because any taint that might have been created by an illegal search warrant had dissipated, it was unnecessary to consider whether the warrant was, in fact, defective).

Evidence that would not have been discovered but for the illegal actions of the police is not necessarily the fruit of the poisonous tree. *Wong Sun* v. *United States,* supra, 487–88; *State* v. *Cates,* supra, 619–20. Thus, a "for want of a nail the kingdom was lost" argument will not suffice. The defendant cannot successfully argue that were it not for the illegal entry into the house, the defendant would not have been in the custody of the police, and, therefore, would not have made any statements that inculpated him in another crime. In this case, an underlying question to be resolved is whether the statements were, in fact, the product of the warrantless arrest.

"[T]he question to be resolved concerning the admissibility of derivative evidence is whether, granting establishment of the primary illegality, the evidence to which the objection is made has been come at by exploitation of [the initial] illegality or instead by means

sufficiently distinguishable to be purged of the primary taint. . . . This standard reflects a deterrence based policy, which is [t]he core rationale consistently advanced . . . for extending the exclusionary rule to evidence that is the fruit of unlawful police conduct . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Ostroski,* supra, 545–46. In deciding whether the evidence should be suppressed, the courts "have focused upon the attenuation aspect; at what point does the nexus between the fourth amendment violation and the challenged evidence . . . become so attenuated as to dissipate the taint of the primary illegality." Id., 546.

The question of whether evidence is attenuated from the initial illegality and is thus a product of a defendant's free will "must be answered on the facts of each case. No single fact is dispositive." *Brown* v. *Illinois,* supra, 603. In determining whether the confession was obtained by exploitation of the illegal arrest, relevant factors include whether the defendant was given *Miranda* rights that broke the connection with the initial illegality, the temporal proximity between the arrest and the statements sought to be suppressed, the presence of intervening circumstances and the purpose and flagrancy of the official misconduct. Id., 603–604; *State* v. *Cates,* supra, 621–24; *State* v. *Ostroski,* supra, 547.

The flaw in the defendant's argument that the statements should be suppressed is that the evidence was "uncovered" by the Wallingford police and not the West Haven police. The defendant's statements were not the product of the West Haven warrantless arrest, but of the proper Wallingford investigation. The statements were made to a different sovereign conducting an independent investigation and had no relation to the crime for which the allegedly illegal arrest was made but related to a wholly different and unrelated crime.

The purpose of the exclusionary rule is to penalize law enforcement officials by suppressing evidence obtained by illegal means in order to deter police conduct that tramples on the fourth amendment rights of citizens. The application of the exclusionary rule to the Wallingford police in this case would not serve to deter future improper conduct on the part of the West Haven police, and it would unfairly penalize the proper investigatory efforts of the Wallingford detectives.

We find that a review of the other relevant factors supports the conclusion that any statements made to the Wallingford detectives were sufficiently attenuated from the initial arrest so as to be purged of any taint. Here, unlike in *State* v. *Geisler,* 22 Conn. App. 142, 576 A.2d 1283, cert. denied, 215 Conn. 819, 576 A.2d 547 (1990), vacated, 498 U.S. 1019, 111 S. Ct. 663, 112 L. Ed. 2d 657, aff'd on remand, 25 Conn. App. 282, 594 A.2d 985 (1991), aff'd, 222 Conn. 672, 610 A.2d 1225 (1992), there was a period of eight or nine hours between the allegedly illegal arrest and the statements sought to be suppressed. Thus, temporal proximity is lacking. The statements made by the defendant to the detectives were voluntary, and were not elicited as a result of intensive interrogation. See *State* v. *Copeland,* 205 Conn. 201, 207, 530 A.2d 603 (1987). One of the statements was made after *Miranda* warnings, and, although the warnings are not necessarily sufficient to break the connection between the illegal act and the statement, their existence is a factor. Id. In addition, there is no evidence that, during the defendant's incarceration, he was extensively questioned, fingerprinted, subjected to a lineup, or spent any sustained period of time doing anything other than sitting in a jail cell. Compare *Taylor* v. *Alabama,* 457 U.S. 687, 691, 102 S. Ct. 2664, 73 L. Ed. 2d 314 (1982).

In sum, this is not a case in which the defendant "was arrested without probable cause in the hope that some-

thing would turn up, and he confessed shortly thereafter without any meaningful intervening event." *Taylor* v. *Alabama, supra.* Our careful examination of the record as a whole discloses that even if the defendant's statements to the Wallingford police were to be considered a product of the initial arrest by the West Haven police, such evidence was sufficiently purged of any taint created by the initial arrest so that its admission was proper.

## B

The defendant's next claim is that the court improperly permitted Detectives Shanley and Milewski to testify at trial regarding the defendant's invocation of his constitutional rights, namely, the refusal to consent to a warrantless body search, the refusal to waive any rights, and the desire to speak to an attorney. The defendant attempted to preclude this testimony by means of a pretrial motion to suppress, a pretrial motion in limine, and a second motion in limine prior to the testimony of Shanley and Milewski. The first two motions were denied by the suppression court and the second motion in limine was denied by the trial court. The specific ground for the motions was that if the testimony was admitted into evidence, the defendant's constitutional rights, as defined in *Doyle* v. *Ohio,* 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), would be violated.

"The factual predicate of a claimed *Doyle* violation is the use by the state of a defendant's postarrest and post*Miranda* silence either for impeachment or as affirmative proof of his guilt." *State* v. *Joly,* 219 Conn. 234, 256, 593 A.2d 96 (1991). The introduction of evidence concerning the defendant's invocation of his constitutional rights is constitutionally prohibited if such evidence is introduced for the purpose of impeaching[8]

---

[8] Obviously the evidence could not have been offered to impeach the defendant's credibility as the defendant exercised his right not to testify.

the defendant or demonstrating his guilt, but such evidence may be presented to show the investigative effort made by the police and the sequence of events as they unfolded, or the adequacy of the *Miranda* warnings given. *State* v. *Jones,* 215 Conn. 173, 186, 575 A.2d 216 (1990); *State* v. *Casey,* 201 Conn. 174, 183, 513 A.2d 1183 (1986); *State* v. *Moye,* 177 Conn. 487, 496–99, 418 A.2d 870, vacated and remanded on other grounds, 444 U.S. 893, 100 S. Ct. 199, 62 L. Ed. 2d 129, on remand, 179 Conn. 761, 409 A.2d 149 (1979); *State* v. *Rogers,* 9 Conn. App. 208, 217, 518 A.2d 399, cert. denied, 202 Conn. 806, 520 A.2d 1288, cert. denied, 481 U.S. 1051, 107 S. Ct. 2185, 95 L. Ed. 2d 841 (1987).

Here, the statements about the invocation of the defendant's *Miranda* rights related to the "silence" described in *Doyle* because they were an affirmative expression of the defendant's refusal to give up any rights, and to his right to speak to an attorney. The silence of *Doyle* includes orally claiming constitutional rights as well as remaining mute. *Wainwright* v. *Greenfield,* 474 U.S. 284, 295 n.13, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986); *State* v. *Casey,* supra.

The rationale of *Doyle* is that it would be fundamentally unfair if the state, after having told defendants, via *Miranda* warnings, that they have a right to remain silent, later uses that silence against them. The silence of a defendant is ambiguous because it cannot be known whether it is an assertion of his constitutional rights or an indication of his guilt. If a defendant chooses to assert his *Miranda* rights, the state may not comment on that assertion during trial. *State* v. *Apostle,* 8 Conn. App. 216, 223, 512 A.2d 947 (1986). The introduction into evidence in this case of the defendant's statements was violative of the defendant's due process rights because it was equivalent to an impermissible comment on his right to remain silent.

The next question is whether the statements had a direct impact on the substantive issue of the defendant's guilt or whether they merely showed the investigative efforts of the state or the sequence of events. If the former is true, the admissibility of the statements would be harmful, and the defendant would be entitled to a new trial. If the latter is the case, the admissibility would be harmless, and the defendant's conviction would be upheld. *State* v. *Jones,* supra, 186.

Because the admission of the statements was of constitutional dimension, the state has the burden of proving their admission was harmless beyond a reasonable doubt. *Chapman* v. *California,* 386 U.S. 18, 24–26, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). "The test for harmfulness is whether there is a reasonable possibility that the improperly admitted evidence contributed to the conviction . . . . The harmlessness of an error depends upon its impact on the trier and the result, not upon whether the particular evidence involved was legally essential to support the finding." (Citations omitted; internal quotation marks omitted.) *State* v. *Jones,* supra, 184–85. The statements of the defendant that involved his constitutional rights were among other statements he made and were part of a colloquy between him and the two officers. The testimony only established the chronology and background of the statements. The state did not comment on the statements during its closing arguments. This makes it unlikely that the statements had a reasonable possibility of making an impact on the substantive issue of the defendant's guilt.

Our review of the record indicates that the evidence presented to the jury was more than sufficient to sustain its verdict even if testimony concerning the defendant's invocation of his constitutional rights had not been admitted. The admission of such testimony is harmless where, as here, the state does not focus on or highlight

the defendant's silence. Id., 185. The reference to the defendant's invocation of his constitutional rights was slight in the context of the entire trial. Such evidence was presented only in the course of the narrative testimony of two witnesses and comprised only a few minutes in a fourteen day trial and a few transcript pages out of more than 1000. See *Brecht* v. *Abrahamson,* 507 U.S.    , 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993) (improper references to defendant's post*Miranda* silence that comprised less than two pages of a 900 page transcript and a few minutes in a four day trial constituted harmless error).

"[T]he central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence . . . ." *Delaware* v. *Van Arsdall,* 475 U.S. 673, 681, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986). " '[T]he Constitution entitles a criminal defendant to a fair trial, not a perfect one.' " *Ross* v. *Oklahoma,* 487 U.S. 81, 91, 108 S. Ct. 2273, 101 L. Ed. 2d 80 (1988); *State* v. *Canty,* 223 Conn. 703, 722, 613 A.2d 1287 (1992). Here, the defendant received that to which he is constitutionally entitled, a fair trial. We conclude that the *Doyle* violation was so insignificant that it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict without the impermissible admission. See *State* v. *Jones,* supra, 185.

The judgment is affirmed.

In this opinion the other judges concurred.