STATE OF CONNECTICUT *v.* BRYAN BLACKMAN
(SC 15401)

Callahan, C. J., and Borden, Katz, Palmer and McDonald, Js.

Argued June 3—officially released August 25, 1998

*Lauren Weisfeld,* assistant public defender, for the appellant (defendant).

*Lisa Herskowitz,* assistant state's attorney, with whom, on the brief, were *James E. Thomas,* state's attorney, and *Joan Alexander,* supervisory assistant state's attorney, for the appellee (state).

*Opinion*

MCDONALD, J. The defendant, Bryan Blackman,[1] was tried by a jury and convicted of murder in violation of General Statutes § 53a-54a,[2] and felony murder in violation of General Statutes § 53a-54c.[3] He appeals his convictions pursuant to General Statutes § 51-199 (b) (3),[4] claiming that: (1) the trial court improperly denied his motion to suppress his statements to the Bristol

---

[1] The defendant is known as Bryan Blackman and Kevin Harris. Because the defendant refers to himself as Bryan Blackman, and the state refers to him as Bryan Blackman, we do so as well.

[2] General Statutes § 53a-54a provides in relevant part: "Murder. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

[3] General Statutes § 53a-54c provides in relevant part:."A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery . . . and, in the course of and in furtherance of such crime or of flight therefrom, he . . . causes the death of a person . . . ."

[4] General Statutes (Rev. to 1997) § 51-199 (b) provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony . . . for which the maximum sentence which may be imposed exceeds twenty years . . . ." Section 51-199 (b) was recently amended by Public Acts 1997, No. 97-178, § 2.

police department, which, he claims, were the tainted fruit of an illegal seizure; (2) the evidence was insufficient to show that he intended to kill the victim; and (3) the trial court gave an improper reasonable doubt instruction. We affirm the judgment of the trial court.

The jury heard the following evidence. At approximately 2:30 a.m. on September 4, 1993, the defendant visited Lorraine Clouse, who lived at 93 Davis Drive in Bristol, and showed her a .22 caliber pistol. After about twenty minutes, the defendant left Clouse's home, taking the gun with him. Soon thereafter, the defendant returned to Clouse's home and asked her for a hat, saying he was going to rob someone. Clouse told the defendant that she did not have a hat, and he said that he was still going to commit the robbery. Clouse followed the defendant outside, where she watched him approach the victim, who was walking down the street alone. The defendant took out the gun, moved very close to the victim, pointed it at the victim's head and demanded money. Clouse did not see the victim give the defendant any money, but saw the defendant fire a shot at the victim's head.

After firing the shot, the defendant ran away. Clouse went inside her house and locked her door. Shortly thereafter, the defendant knocked on her door and she let him in. The defendant went through Clouse's apartment and out the back door. Clouse went to bed before the police arrived.

Ketsy Rosario, who also lived on Davis Drive, heard a gunshot when she was outside in the Davis Drive area on September 4, 1993. Approximately thirty minutes later, the defendant approached her, and told her to "check it out," pointing toward the corner of a nearby building. He then said, "you haven't seen me," and left. Rosario later went to the area to which the defendant pointed, and saw a body on the ground.

Kim Del Valle and Carrie Reynolds were returning to Davis Drive at approximately 3:30 a.m. when the defendant, whom they knew, came up to them and asked them for a ride, claiming that his child was sick. The defendant appeared anxious and nervous. On the way to the defendant's home, they passed a police roadblock, and the defendant turned his head toward the middle of the car, away from the police cruiser. Reynolds thereafter dropped off the defendant.

The victim, Richard Whipple, was pronounced dead at a local hospital that night. The cause of death was determined to be a gunshot wound to the right eye. The bullet was .22 caliber, and the autopsy revealed that the muzzle of the gun was between eight and twenty-four inches from the victim's right eye when fired.

Trooper William Podgorski of the Connecticut state police testified that, one week after the shooting, on September 11, 1993, he was assigned to the state police sobriety checkpoint on Route 69 in Wolcott. At approximately 2:45 a.m., Podgorski stopped the defendant and asked him for his driver's license and registration. The defendant could not produce a license or any photographic identification, and he told Podgorski that his name was Bryan Blackman. Podgorski performed a motor vehicle data check and determined that the defendant did not have a license and, moreover, that he had received a motor vehicle infraction summons. In accordance with standard procedure, Podgorski took the defendant into custody and transported him to the Troop A barracks in Southbury.

Detective Edward Spyros of the Bristol police department met with the defendant in his cell in Southbury and gave the defendant a waiver of rights form, which the defendant read and initialed. Although the defendant first offered Spyros an alibi for the night of the shooting, he later admitted being at the scene of the crime.

At the hearing on the defendant's motion to suppress his statements, the trial court heard the following testimony. In accordance with state police procedure, the state police had issued prior news releases about the time and place of the sobriety checkpoint at which the defendant had been stopped. Moreover, a master sergeant had discussed with a judge in Waterbury the procedures to be used at the checkpoint. The judge had explained what was necessary for the checkpoint to be legal. Podgorski believed that state police procedures were followed. Podgorski testified that the police stopped every vehicle and asked every driver for his or her driver's license and vehicle registration.

At the Troop A barracks, Podgorski read the defendant his *Miranda*[5] warnings and asked him if he understood them. The defendant indicated that he did. The police processed the defendant and placed him in a holding cell. The state police had learned, prior to releasing the defendant, that the Bristol police had a warrant for his arrest on charges of breach of the peace and third degree assault. The state police notified the Bristol police, and the defendant was released into the custody of detective Spyros at approximately 4:52 p.m. on September 11. Spyros had reason to believe that the defendant was involved in the Davis Drive murder. Spyros met with the defendant in his cell in Southbury and gave him a waiver of rights form, which he read and initialed. Spyros asked the defendant if he understood his rights, and the defendant indicated that he did. The defendant then proceeded to talk with Spyros. Their discussion began in Southbury, continued during the ride to Bristol and ended at the Bristol police station. Their discussion lasted from 5 p.m. to 6 p.m., then from 7:30 p.m. to 10 p.m., and finally from 12 a.m. to 12:30 a.m. on September 12.

---

[5] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

The defendant told Spyros that his real name was Kevin Harris, not Bryan Blackman, and that he had used the alias because he was on probation in Florida for automobile theft. Sometime during their discussion, Spyros told the defendant that there was a warrant for his arrest in Florida, and that Florida might want to have him extradited. Spyros asked the defendant if he knew why the Bristol police wanted to talk to him. The defendant replied that people on Davis Drive were saying that he had shot the victim, but would not say what had happened, for fear of being killed upon his release from jail. The defendant told Spyros that he would rather "take the body [murder] charge" than either tell the police what had happened or return to Florida. The defendant asked to speak with his girlfriend, which he did. When the defendant told Spyros that he wanted to speak with his lawyer, the interrogation ceased.

# I

We begin with the defendant's claim that, but for the illegal motor vehicle arrest, he would not have been available to the Bristol police, and that his identification and statements are therefore the tainted "fruits" of that arrest that should be suppressed.[6] The state, while not conceding the illegality of the stop, argues that, even if the motor vehicle stop was illegal, the defendant's statements were not the "fruits" of that illegality. The state argues, further, that, even if they were, the taint was sufficiently attenuated and thus the evidence was properly admitted. We agree with the state.

---

[6] The defendant claims that the police action violated the fourth amendment to the United States constitution and article first, §§ 7 through 9, of the Connecticut constitution. The defendant does not explain or cite any authority, however, as to why, in the circumstances of this case, the Connecticut constitution provides broader protection than the fourth amendment, and specifically why the Connecticut constitution requires the suppression of his statement. Therefore, we do not conduct a separate state constitutional analysis. See State v. Colvin, 241 Conn. 650, 661 n.7, 697 A.2d 1122 (1997).

The trial court found that the defendant had been taken into custody pursuant to a warrantless stop for a motor vehicle violation. It also found that the state had failed to prove that the initial stop of the defendant was reasonable, and, therefore, concluded that the initial stop was an improper seizure. See footnote 9 of this opinion. The court also found, however, that the Bristol police, who had a valid arrest warrant and knew that the defendant was a fugitive, did not improperly *utilize* the illegal motor vehicle stop. The trial court found, further, that the defendant's statements were not a product of the initial stop, and "any taint by virtue of the stop by the state police . . . was innocent, was minimal and certainly . . . not a violation of a [fourth] amendment right to so exclude [the] statements of the defendant." Because the defendant's statements were not the product of an exploitation of any illegality, and because they were sufficiently attenuated to purge any primary taint, the trial court denied the defendant's motion to suppress.

"Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Colvin*, 241 Conn. 650, 656, 697 A.2d 1122 (1997).

"Under the exclusionary rule, evidence must be suppressed if it is found to be the 'fruit' of prior police illegality. *Wong Sun* v. *United States*, [371 U.S. 471, 485, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963)]. All evidence is not, however, a 'fruit of the poisonous tree' simply because it would not have been discovered but for the

illegal action of law enforcement officials. Id., 487–88 . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Colvin*, supra, 241 Conn. 656; cf. *United States* v. *Leon*, 468 U.S. 897, 910–11, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984).

We first consider whether the challenged evidence was the product, or the "fruit," of illegal government activity. See *United States* v. *Crews*, 445 U.S. 463, 471, 100 S. Ct. 1244, 63 L. Ed. 2d 537 (1980); *State* v. *Colvin*, supra, 241 Conn. 656–57. Prior case law, particularly *State* v. *Colvin*, supra, 650, and *State* v. *Daugaard*, 32 Conn. App. 483, 630 A.2d 96 (1993), aff'd on other grounds, 231 Conn. 195, 647 A.2d 342 (1994), cert. denied, 513 U.S. 1099, 115 S. Ct. 770, 130 L. Ed. 2d 666 (1995), is instructive in determining what is the fruit of illegal police action.

In *Colvin*, we considered whether cocaine seized while in plain view was the product of the defendant's illegal detention. The police officers, who were conducting a narcotics surveillance, approached the defendant and ordered him to walk with them to his car. *State* v. *Colvin*, supra, 241 Conn. 653. While talking on the sidewalk next to the car, one of the officers looked inside the vehicle and observed in plain view a bag containing cocaine. Id., 653–54. The officers seized the bag and charged the defendant with possession of narcotics. Id., 654. We assumed without deciding that the original detention of the defendant, which occurred before the officers required the defendant to follow them to his car, was illegal. See id., 655 n.4. We concluded, however, that the subsequent discovery of the cocaine was not the product of the illegal seizure, because nothing the defendant did or said during the detention caused the officer to look into his vehicle, and the officers knew which car was his before approaching him. Id., 658. The officers had a lawful right to be standing on the sidewalk, and the narcotic substance was in

plain view. Id., 660. Consequently, there was no causal connection between the illegal detention and the discovery of the cocaine. Id., 659. We explained that "[t]he defendant . . . has provided no authority to support the contention that the concurrent nature of two causally distinct events, in and of itself, is a sufficient basis in this case to conclude that the discovery of the cocaine was tainted by the allegedly unlawful arrest." Id.

In *Daugaard*, the defendant challenged the admission of statements concerning a sexual assault, which he had made to the Wallingford police following his warrantless arrest by the West Haven police on a complaint that he had stolen a car. *State* v. *Daugaard*, supra, 32 Conn. App. 496. The Appellate Court held that, even if the West Haven arrest was illegal, "[t]he defendant's statements were not the product of the West Haven warrantless arrest, but of the proper Wallingford investigation. The statements were made to a different sovereign conducting an independent investigation and had no relation to the crime for which the allegedly illegal arrest was made but related to a wholly different and unrelated crime. The purpose of the exclusionary rule is to penalize law enforcement officials by suppressing evidence obtained by illegal means in order to deter police conduct that tramples on the fourth amendment rights of citizens. The application of the exclusionary rule to the Wallingford police in this case would not serve to deter future improper conduct on the part of the West Haven police, and it would unfairly penalize the proper investigatory efforts of the Wallingford detectives." Id., 500–501.

This case is very similar to both *Colvin* and *Daugaard*. The alleged illegal police action was the motor vehicle stop. The defendant's statements, however, did not come about because of that stop, but, rather, were

a product of the execution of the Bristol police department's valid arrest warrant and subsequent lawful interrogation.[7] While the motor vehicle stop originally brought the defendant into the custody of the state police, the Bristol police department was empowered under the law to arrest the defendant at any time or place in Connecticut pursuant to a valid arrest warrant. The fact that the defendant was in custody in Southbury merely facilitated the execution of the warrant; it did not render the execution of the warrant illegal. Because the defendant was taken into the custody of the Bristol police department pursuant to a valid arrest warrant, his statements while in custody were not the product of the allegedly illegal motor vehicle stop. Thus, the defendant's statements were properly admitted.

Moreover, even if we were to conclude that the statements were a product of illegal police action, their taint was sufficiently attenuated to render their admission proper. "Under *Wong Sun*, the question to be resolved concerning the admissibility of derivative evidence is whether, granting establishment of the primary illegality, the evidence to which the objection is made has been come at by exploitation of [the initial] illegality or instead by means sufficiently distinguishable to be purged of the primary taint. . . . This standard reflects a deterrence based policy, which is [t]he core rationale consistently advanced . . . for extending the exclusionary rule to evidence that is the fruit of unlawful police conduct . . . . *Nix* v. *Williams*, 467 U.S. 431, 442, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984); *State* v. *Derrico*, 181 Conn. 151, 157, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980)." (Citations omitted; internal quotation marks omitted.) *State* v. *Ostroski*, 201 Conn. 534, 545–46, 518 A.2d 915 (1986).

---

[7] The defendant does not claim that the arrest warrant was invalid, or that the interrogation by Bristol police was unlawful.

"The [United States Supreme Court in *Brown* v. *Illinois*, 422 U.S. 590, 603–604, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975)] explained that the factors to be considered in determining whether the taint has been dissipated include the temporal proximity of the illegal police action and the discovery of the evidence, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct." (Internal quotation marks omitted.) *State* v. *Cates*, 202 Conn. 615, 621, 522 A.2d 788 (1987). Another factor to consider is whether the suspect was apprised of his or her *Miranda* rights. *State* v. *Copeland*, 205 Conn. 201, 207, 530 A.2d 603 (1987).

In this case, the defendant made incriminating statements approximately fourteen hours after the motor vehicle stop. His statements therefore lacked temporal proximity to the allegedly illegal police action. See *State* v. *Ostroski*, supra, 201 Conn. 548–49 (thirty-six hours between illegal arrest and statement); *State* v. *Daugaard*, supra, 32 Conn. App. 501 (eight or nine hours between illegal arrest and statements). Moreover, intervening circumstances, such as the transportation of the defendant from Southbury to Bristol, a second *Miranda* warning and interrogation by a different police department, also broke any claimed chain of causation between the allegedly illegal stop and the defendant's statements. While the defendant made incriminating statements while he was in police custody,[8] he made

---

[8] Moreover, the defendant's statements were made voluntarily, and were not the product of intensive or coercive interrogation. See *State* v. *Copeland*, supra, 205 Conn. 207; *State* v. *Daugaard*, supra, 32 Conn. App. 501. The defendant appears to claim that his statements may have been the product of threats made by the investigating detective suggesting that he would be extradited to Florida. There is no evidence in the record, however, that the police threatened the defendant with extradition, or promised that he would not be extradited if he confessed. Rather, Spyros testified that the defendant had volunteered at the beginning of their discussion that he was wanted in Florida and that he did not want to return there. Spyros merely confirmed that the defendant was, in fact, wanted in Florida, and that the Florida

them while being interrogated by the Bristol police, not the state police who had conducted the checkpoint stop.

Finally, the purpose of the allegedly illegal stop was to check the sobriety of drivers. Thus, the aim of the stop was totally unrelated to apprehending the defendant. Nor was the stop intended to obtain incriminating statements from the defendant about the Davis Drive murder. The alleged misconduct of the state police officers conducting the sobriety checkpoint, if any,[9] was not deliberate, as they set up the checkpoint after consulting with a judge.

Suppression of the defendant's statements would not deter the police from acting unlawfully, which is the main purpose of the exclusionary rule, because the Bristol police did nothing unlawful. See *State* v. *Daugaard*, supra, 32 Conn. App. 501. Because the defendant's statements were obtained through the lawful actions of the Bristol police, the prosecution in this case would be penalized unfairly by the actions of the state police, who acted entirely independent of the Bristol police. See id. Accordingly, we conclude that the trial court properly denied the defendant's motion to suppress.

## II

We next conclude, notwithstanding the defendant's arguments, that the evidence was sufficient to support

authorities had indicated that they wanted to extradite him. Conveying this information to the defendant was not coercive, and did not render the defendant's statements involuntary.

[9] At the time of the trial court's ruling, the trial court was unaware of any Connecticut appellate authority upholding the constitutionality of the procedures followed by the state police in establishing the sobriety checkpoint. Subsequently, however, in *State* v. *Boisvert*, 40 Conn. App. 420, 671 A.2d 834, cert. denied, 237 Conn. 903, 674 A.2d 1332 (1996), the Appellate Court upheld the legality of a sobriety checkpoint at which the same procedures used to establish the checkpoint in this case were followed.

his murder conviction. In reviewing a sufficiency of the evidence claim, we must apply a two part test. "First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Sivri*, 231 Conn. 115, 126, 646 A.2d 169 (1994).

The defendant claims that the evidence was insufficient to prove beyond a reasonable doubt that he intended to kill the victim. "The specific intent to kill is an essential element of the crime of murder. To act intentionally, the defendant must have had the conscious objective to cause the death of the victim. . . . Intent is generally proven by circumstantial evidence because direct evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom. . . . This does not require that each subordinate conclusion established by or inferred from evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because this court has held that a jury's factual inferences that support a guilty verdict need only be reasonable. . . . Nevertheless, because intent to cause the death of a person is an element of the crime . . . that intent must be proven beyond a reasonable doubt. . . . Furthermore, [i]ntent to cause death may be inferred from the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death." (Citations omitted; internal quotation marks omitted.) Id., 126–27.

The jury reasonably could have found that the defendant intended to kill the victim. The defendant shot the

victim with a .22 caliber pistol, at a distance of between eight and twenty-four inches from the victim's right eye. On the basis of the weapon used, a pistol, the short distance from which it was fired and the fact that it was aimed at the victim's head, the jury reasonably could infer that the defendant intended to kill the victim. See *State* v. *Patterson*, 229 Conn. 328, 333, 641 A.2d 123 (1994) (defendant fatally shot victim from close range with .38 caliber revolver). We conclude, therefore, that the evidence was sufficient for the jury to conclude beyond a reasonable doubt that the defendant intended to kill the victim.

## III

The defendant's last claim is that the trial court's instruction to the jury[10] that "[a] reasonable doubt is a

[10] The trial court's instruction provided in relevant part: "A defendant is not required to establish his innocence. He need not produce any evidence whatsoever, if he chooses not to do so. The burden is upon the state to prove a defendant guilty beyond a reasonable doubt. If it fails, the defendant has a right to rely upon that failure and a right to be found not guilty.

"Now, in this case, as in all criminal prosecutions, the defendant is presumed to be innocent until proven guilty beyond a reasonable doubt. This presumption of innocence was with this defendant when he was first presented for trial in this case, and it continues with him throughout this trial. As far as you are concerned, the defendant is innocent, and he continues to be innocent, unless and until such time as all of the evidence produced here, in the orderly conduct of the case, considered in the light of these instructions of law and deliberated upon by you in the jury room, satisf[ies] you beyond a reasonable doubt that he is guilty. Thus, the presumption of innocence alone is sufficient to acquit the defendant. The presumption remains with the defendant throughout the trial unless you are satisfied beyond a reasonable doubt of the defendant's guilt from all of the evidence in the case.

"The burden to prove the defendant guilty of the crimes with which he was charged is upon the state. The defendant does not have to prove his innocence. This means that the state must prove beyond a reasonable doubt each and every element necessary to constitute the crime charged . . . .

"The phrase reasonable doubt has no technical or unusual meaning. You can arrive at the real meaning of it by emphasizing the word reasonable. A reasonable doubt is a doubt which is something more than a guess or a surmise. It is not a conjecture or a fanciful doubt. A reasonable doubt is not a doubt which is raised by someone simply for the sake of raising doubts,

doubt based upon reason, not on the *mere possibility of innocence*"; (emphasis added); violated his right to due process and deprived him of a fair trial. We conclude that the trial court's reasonable doubt instruction neither denied the defendant the presumption of innocence nor shifted the burden to him to prove his innocence. The instruction did not deprive the defendant of due process.

Because the defendant did not preserve his claim at trial, he seeks to prevail pursuant to *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). To prevail under *Golding*, the defendant must show that "the claim is of constitutional magnitude alleging the violation of a fundamental right [and that] the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial . . . ." Id., 239–40. We conclude that the trial court's instruction did not constitute a constitutional violation and, therefore, the defendant's claim is not entitled to *Golding* review.

We examine the phrase that the defendant challenges in the context of the rest of the trial court's charge on reasonable doubt. "[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." (Internal quotation marks omitted.) *State* v. *DelVecchio*, 191 Conn. 412, 421, 464 A.2d 813 (1983). We have upheld, as constitutional, reasonable doubt instructions that have included the

---

nor is it a doubt suggested by the ingenuity of counsel or any of the jurors, which is not justified by the evidence or lack of evidence. A reasonable doubt is a doubt based upon reason, *not on the mere possibility of innocence.* It is not enough for the state to make out a case of probable doubt. The burden on the state never shifts to prove the defendant guilty beyond a reasonable doubt." (Emphasis added.)

After hearing the parties' exceptions to the charge, the trial court corrected the statement that "it is not enough for the state to make out a case of probable *doubt*"; (emphasis added); by telling the jury it had meant to say probable *guilt*. By agreement of the parties, the trial court reread its reasonable doubt instruction, inserting "guilt" in place of "doubt."

phrase "not on the mere possibility of innocence." *State v. Taylor*, 239 Conn. 481, 504–505 & n.12, 687 A.2d 489 (1996), cert. denied, 521 U.S. 1121, 117 S. Ct. 2515, 138 L. Ed. 2d 1017 (1997); *State* v. *Romero*, 42 Conn. App. 555, 560–63 & n.8, 681 A.2d 354, cert. denied, 239 Conn. 935, 684 A.2d 710 (1996); *State* v. *Rodriguez*, 37 Conn. App. 589, 616–19, 658 A.2d 98, cert. denied, 234 Conn. 916, 661 A.2d 97 (1995); see also 5 D. Borden & L. Orland, Connecticut Practice: Criminal Jury Instructions (2d Ed. 1997) § 2.9, p. 79 (model jury instruction stating that "[a] reasonable doubt is a doubt based on reason and not on the mere possibility of innocence"). In *Taylor*, we held that the trial court's instructions, when viewed in their entirety,[11] did not "unconstitutionally dilute the [state's] burden of proof," and, therefore, the defendant failed to show an error of constitutional magnitude. *State* v. *Taylor*, supra, 505.

In this case, the trial court's instruction did not unconstitutionally dilute the state's burden of proof, and it adequately advised the jury on the presumption of innocence. The defendant has failed to show that the inclu-

---

[11] In *Taylor*, the trial court's instructions were substantially similar to those given in this case. The trial court in *Taylor* stated: "The phrase reasonable doubt has no technical or unusual meaning. We can arrive at the real meaning of the phrase by emphasizing the word reasonable. A reasonable doubt is a doubt which is something more than a guess or surmise. It is not a conjecture or a fanciful doubt. A reasonable doubt is not a doubt which is raised by someone simply for the sake of raising doubts, nor is it a doubt suggested by the ingenuity of counsel or any of the jurors which is not justified by the evidence or by the lack of evidence. A reasonable doubt is a doubt based on reason and not on the mere possibility of innocence." (Internal quotation marks omitted.) *State* v. *Taylor*, supra, 239 Conn. 504 n.12. This part of the instruction is virtually identical to the relevant part of the instruction given in this case.

The trial court in *Taylor* continued: "It is a doubt for which you can in your own mind conscientiously give a reason. A reasonable doubt, in other words, is a real doubt, an honest doubt, a doubt which has its foundation in the evidence or lack of evidence. It is the kind of doubt which in the serious affairs of everyday life which concerns us all, we would pay heed and attention to. It is the kind of doubt which would make a reasonable person hesitate to act." (Internal quotation marks omitted.) Id.

sion of the phrase "mere possibility of innocence," in the context of the entire instruction, constituted an error of constitutional magnitude.

The judgment is affirmed.

In this opinion the other justices concurred.